UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
KENNETH P. SILVERMAN, as trustee in
Bankruptcy for HOWARD D. GOLDEN,

                   Plaintiff,                 CV 04-5647 (ETB)

     against-                          <u>MEMORANDUM</u>
                                               <u>OPINION, ORDER</u>
                                               <u>AND JUDGMENT</u>

UNITED STATES OF AMERICA,

                   Defendant.
-----------------------------------------------------------------------x

       The plaintiff, Howard D. Golden ("Golden"), brings this action for negligence, pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346, 2671 <u>et</u> <u>seq.</u>  A bench trial was held before the undersigned on September 25 and 26, 2007.

       The plaintiff seeks to recover damages for a slip and fall that he alleges occurred on the property of the defendant, the United States of America (the "United States" or the "Government").  Specifically, plaintiff alleges that on February 19, 2003, he fell while walking on the sidewalk in front of the United States Post Office located at 12 Washington Avenue in West Sayville, New York as a result of a dangerous condition due to the negligence of the defendant.  Plaintiff further alleges that, as a result of this fall, he sustained severe injuries, including fractures of two of the bones in his leg, requiring corrective surgery.

       The Government denies any liability, asserting that plaintiff did not fall on property belonging to the United States.  The Government further asserts that it did not have actual or constructive knowledge of the existence of a dangerous condition on the sidewalk in front of the post office.

FINDINGS OF FACT

I.    <u>Introduction</u>

In 2003, plaintiff was employed as the "acting administrator" for Sayville Manor, also known as the Sayville Adult Home.  (Tr. 4.)[1]  In the course of his duties at Sayville Manor, plaintiff routinely visited the United States Post Office, located on Washington Avenue in West Sayville (referred to as the "West Sayville Post Office"), for the purpose of retrieving the mail for Savyille Manor as well as the individuals who resided there.  (Tr. 6, 39.)

On February 19, 2003, at approximately 8:30 or 8:45 a.m., plaintiff suffered an injury when he slipped and fell on ice in the vicinity of the West Sayville Post Office.  (Tr. 4.)  There was no snow or other precipitation on February 19, 2003.  (Tr. 5; Pl. Ex. 1.)  However, a snowfall occurred on February 17, 2003, two days prior to plaintiff's accident, with the precipitation ending at approximately 8:00 p.m.  (Tr. 5, 68; Pl. Ex. 1.)

Window services at the West Sayville Post Office then began at 8:00 a.m.  (Tr. 60, 144-45.)  However, the lobby area, where the post office boxes are located, opened at approximately 5:30 or 6:00 a.m.  (Tr. 60, 145.)  Accordingly, the first postal employee typically arrived at the West Sayville Post Office at approximately 5:30 or 5:45 a.m.  (Tr. 60.)  There were approximately twelve postal employees working at the West Sayville Post Office in 2003.  (Tr. 60.)

The parking area in front of the West Sayville Post Office consists of eight or nine perpendicular parking spots.  (Tr. 7, 42.)  When individuals park in front of the West Sayville

_____

[1]  References preceded by "Tr." are to pages of the transcript from the bench trial conducted on September 25 and 26, 2007.

-2-

Post Office, they typically park their cars with the front end hanging over the sidewalk directly in front of the post office.  (Tr. 8, 157.)  There is no curb separating the concrete sidewalk from the street and therefore the street and the sidewalk are essentially the same level.[2]  (Tr. 42, 62, 80, 132.)  Nor are there any lines indicating where the parking spaces are or differentiating the parking lot from the street on which it is located - Washington Avenue.  (Tr. 62.)  Plaintiff's Exhibit 3 illustrates the typical parking arrangement at the West Sayville Post Office.  (Pl. Ex. 3.)

Plaintiff received Worker's Compensation benefits for his medical expenses and did not incur any out-of-pocket medical expenses other than a co-pay.  (Tr. 28-29.)  Plaintiff also received a payment of approximately $14,000 to $15,000 from Worker's Compensation approximately one year after his accident for time lost from work.  (Tr. 31-32.)  As a result, there is currently a Worker's Compensation lien against plaintiff, held by the New York State Insurance Fund, in the sum of $30,914.80.  (Pl. Ex. 20.)


II.    Testimony

A.    Howard Golden

Plaintiff testified that when he arrived at the West Savyille Post Office on February 19, 2003, he parked his car approximately two or three cars to the left of the entrance to the post office.  (Tr. 8-9.)  Plaintiff stated that he then exited his vehicle and stepped onto the sidewalk in front of the West Savyille Post Office.  (Tr. 9.)  According to plaintiff, as he turned

_____

[2] There is approximately a one-inch difference in the height of the sidewalk compared to the street.  (Tr. 81.)

right toward the entrance of the post office, his left leg "went out from under [him]" and he "went down on the ground." (Tr. 9.) Plaintiff did not see what caused him to fall. (Tr. 10.) However, once he was on the ground, plaintiff saw ice on the sidewalk that he believes led to his fall. (Tr. 10.) There was no testimony offered by plaintiff as to the size or height of the ice. Plaintiff described the ice as "very glassy, [with] some opaque parts." (Tr. 10.) Plaintiff did not see any ice prior to stepping on the sidewalk. (Tr. 43-44.)

Plaintiff testified that he remained on the ground for approximately "a couple of seconds" after his fall. (Tr. 11.) When plaintiff attempted to stand up again, he experienced "significant" pain throughout his entire body, concentrated mostly in his left leg and left hip. (Tr. 11.) Plaintiff testified that he was unable to place weight on his left leg and fell to the ground again. (Tr. 11.)

Plaintiff stated that he then crawled to the side of his vehicle and attempted to use the door handle to assist in standing up, but was unsuccessful at doing so. (Tr. 11.) According to plaintiff, while he was lying on the ground, other automobiles began to approach and park near plaintiff's vehicle. (Tr. 11.) Plaintiff testified that he began to crawl on his stomach toward the rear of his vehicle so that he would be visible to those individuals attempting to park their cars in front of the West Sayville Post Office.[3] (Tr. 11-12.) Plaintiff further testified that, at that point, an unknown male observed plaintiff lying on the ground and instructed him to remain where he was and informed him that 911 had been notified. (Tr. 12.) An unknown woman joined the man and the two individuals stood in front of where plaintiff was lying on the ground to prevent him

---

[3] On cross-examination, plaintiff testified that there was nothing, such as ice or snow, preventing him from crawling backwards towards the sidewalk instead of towards the rear of his vehicle. (Tr. 52-53.)

from being hit by any oncoming automobiles.  (Tr. 12.)

Less than ten minutes later, an ambulance and a police officer arrived.  (Tr. 12-13.)  The police officer filled out a police report and the paramedics transported plaintiff, via ambulance, to Southside Hospital in Bay Shore, New York.  (Tr. 13, 47; Pl. Ex. 5.)  Plaintiff testified that he did not enter the West Sayville Post Office at any time on February 19, 2003.  (Tr. 12.)  Nor did he see any of the postal employees that day.  (Tr. 13.)  Plaintiff further testified that he did not see any salt or sand or anything of that nature on the sidewalk in front of the West Sayville Post Office on February 19, 2003.  (Tr. 28.)

After arriving at Southside Hospital, plaintiff was provided with pain medication and x-rays were taken.  (Tr. 14-15.)  Plaintiff was seen by an orthopedist, Dr. Dineen, who informed him that he had fractured his left tibia as well as his left knee.  (Tr. 15.)  Dr. Dineen advised plaintiff of his options of surgery versus casting the leg and ultimately placed a hard cast on plaintiff's left leg, which extended from his thigh to his ankle.  (Tr. 15-16, 47.)  Plaintiff was released from Southside Hospital that same day and spent the night at Sayville Manor, the adult home where he was employed.  (Tr. 16.)

Plaintiff returned home the following day where he received physical therapy and home health aid services.  (Tr. 16-17.)  Plaintiff used a wheelchair during this time and returned to work approximately ten days after his accident, at which time Sayville Manor arranged for plaintiff to have an aide to assist him as well as a wheelchair for his use.  (Tr. 16-17, 22, 30.)  Plaintiff testified that he experienced a rise in his blood pressure during this time and that there

was also "an issue of bleeding."[4]  (Tr. 17.)

Approximately one week after being discharged from the hospital, plaintiff was again seen by Dr. Dineen.  (Tr. 17.)  Additional x-rays were taken and Dr. Dineen advised plaintiff to continue wearing the hard cast, continue with physical therapy and consider the possibility of surgery to correct the fractures.  (Tr. 17.)  Plaintiff testified that he was also advised by the physical therapist during this time that he had a "dropped foot" and that "the muscles were trimmed and weak."  (Tr. 17.)  Plaintiff wore the hard cast on his left leg for approximately one month, during which he was not ambulatory.  (Tr. 18.)

Plaintiff testified that he was next examined by Dr. Nirmal Tejwani at New York University Medial Center, who advised that plaintiff undergo surgery to repair his leg.  (Tr. 18, 48.)  Approximately ten days after his accident, in March 2003, Dr. Tejwani performed surgery on plaintiff's left leg, placing a titanium rod just under plaintiff's knee as well as two pins in his ankle, and replaced the first cast with another full leg cast.[5]  (Tr. 19, 21, 27, 48.)  Plaintiff remained in the hospital overnight following his surgery and wore the second full cast for "a couple of weeks" before it was reduced to a third, smaller cast that extended from his ankle to

---

[4]  On cross-examination, however, plaintiff testified that he had "transient high blood pressure" prior to his accident, which he took medication to help control.  (Tr. 32-33.)  When asked whether he was taking the same blood pressure medications prior to February 19, 2003 as he is currently, plaintiff responded "[a]bsolutely not."  (Tr. 33.)  However, a comparison of plaintiff's deposition testimony from June 2006, in which plaintiff stated that, at that time, he was taking Atenolol, Cardizem and Risinopril for hypertension, (Tr. 34-35), and plaintiff's admission records from Southside Hospital, demonstrate that plaintiff was taking at least two of those  medications - Atenolol and Cardizem - in 2003 when he was admitted to the hospital following his accident.  (Tr. 36; Pl. Ex. 17.)

[5]  Plaintiff's hospital records from Southside Hospital and New York University Medical Center, as well as Dr. Dineen's medical records, were admitted into evidence as Plaintiff's Exhibits 17, 18 and 19, respectively.

his knee. (Tr. 21.) Plaintiff testified that he was not ambulatory while wearing either the second or third cast. (Tr. 21.) After wearing the third cast for approximately two weeks, plaintiff was provided with a mini cast, which he described as a plastic cast that he was only required to wear while walking and could take off while he was resting. (Tr. 21-22.) Plaintiff testified that when the third cast was removed, he was advised by both Dr. Tejwani and his physical therapist that he was still suffering from a dropped foot.[6] (Tr. 22.) Plaintiff further testified that during the time that he wore the three casts, he experienced pain but that it was controlled through medication, specifically, Percocet, Advil and Vicodin. (Tr. 22.)

Approximately ninety days after his surgery, plaintiff first became ambulatory and was able to walk with the help of a walker. (Tr. 23.) Plaintiff testified that he used the walker for "a few weeks," after which he was given a cane that he used on and off for approximately one year. (Tr. 23.) Plaintiff did not undergo any further physical therapy following his March 2003 surgery, nor was any recommended by Dr. Tejwani. (Tr. 50.) Plaintiff continues to see Dr. Tejwani "from time to time" but testified that he had not seen him in the last year. (Tr. 24.)

Plaintiff further testified that he still has a "significant amount of tenderness" in his left ankle where the pins are located, as well as pain in his left leg where the rod is located. (Tr. 25.) Plaintiff stated that, since the accident, he is unable to walk more than one or two blocks at a time without stopping and is no longer able to exercise as he did before. (Tr. 25-26.) Plaintiff further stated that driving is now difficult at times and that he is no longer able to ski. (Tr. 25-26.) Although Dr. Tejwani has advised plaintiff that he has the option of undergoing a further

---

[6] Plaintiff has never attempted to correct his dropped foot through the use of an orthotic device. (Tr. 49.)

surgery to remove the rod and pins from his leg, plaintiff has elected not to do so and the rod and pins remain in his ankle. (Tr. 26-27, 49.)

Finally, plaintiff testified that he suffered a prior injury to his left ankle in or around 1987 when he severely strained the ligament while playing basketball. (Tr. 27-28.) Plaintiff's left ankle was placed in a cast at that time and according to plaintiff, approximately one month later he was "back to full activity" without any limitations thereafter. (Tr. 28.) Plaintiff testified that he did not have any problems or complaints with regard to his left ankle following this incident and prior to his accident on February 19, 2003.[7] (Tr. 28.) Nor has plaintiff re-injured his left leg in any way since his accident. (Tr. 28.)

On cross-examination, plaintiff testified that since he typically went to the West Sayville Post Office every workday, he assumed that he was there the day prior to his accident - February 18, 2003. (Tr. 43.) Plaintiff did not complain to any postal employee that there was ice on the sidewalk in front of the post office on February 18, 2003. (Tr. 43.) Nor did plaintiff render such a complaint on February 19, 2003, the day of his accident. (Tr. 43.)

When asked on cross-examination whether he advised Southside Hospital that he "slipped on ice getting out of the car," plaintiff responded "absolutely not." (Tr. 53.) However, a review of plaintiff's admission records from Southside Hospital demonstrates that is what is listed as plaintiff's chief complaint on February 19, 2003. (Pl. Ex. 17.) Plaintiff confirmed that all of the other information listed on his admission records, such as his age, date of birth, the medications he was taking, his insurance information and his next of kin, were all correct. (Tr.

_____

[7] Plaintiff did, however, have a herniated lumbar disc at L4 at the time he was admitted to Southside Hospital on February 19, 2003, which he testified was a condition he suffered from prior to his accident. (Tr. 54; Pl. Ex. 17.)

54–56.)  Plaintiff reiterated that he did not inform the admitting nurse that he slipped on ice getting out of his car and stated that he assumed that was "her interpretation" of what he said actually occurred.  (Tr. 54.)

        B.      <u>Doctor Sanford A. Ratzan</u>

Dr. Sanford A. Ratzan ("Dr. Ratzan"), a physician licensed to practice medicine in New York, testified as an expert witness on behalf of plaintiff.  (Tr. 96.)  Dr. Ratzan received his medical license in 1966 after graduating from Columbia University College of Physicians and Surgeons in 1965.  (Tr. 96.)  After completing a one-year surgical internship as well as one year of general surgical residency at St. Luke's Hospital in New York City, Dr. Ratzan served in the United States Army from 1967 to 1969 and spent one year in Vietnam serving as a trauma orthopedist.  (Tr. 96-97.)  Upon his discharge from the Army, Dr. Ratzan received three years of orthopedic training and thereafter went into private practice in Bay Shore, New York.  (Tr. 97.)  Dr. Ratzan is presently the Chief of Orthopedics at Good Samaritan Hospital in West Islip and is engaged in private practice as an orthopedic surgeon.  (Tr. 97.)  Dr. Ratzan is board certified in the field of orthopedic surgery and has been published on three occasions pertaining to orthopedic surgery - specifically, in relation to cervical spine, femoral neck and hip fractures - in 1974, 1975 and 1976.  (Tr. 98.)  Dr. Ratzan testified that he provides expert testimony in civil lawsuits approximately once every one to two years but has never testified with respect to any tibia or fibula fractures.  (Tr. 99.)

Dr. Ratzan testified that he examined the plaintiff on July 27, 2006, at the request of plaintiff's counsel.  (Tr. 99.)  In connection with his examination of plaintiff, Dr. Ratzan also reviewed plaintiff's emergency room records from Southside Hospital, his x-rays, Dr. Dineen's

records pertaining to plaintiff, as well as Dr. Tejwani's, and plaintiff's hospital records from New York University Medical Center. (Tr. 99-100.) Dr. Ratzan also received a history of how plaintiff was injured from plaintiff himself. (Tr. 100.)

Dr. Ratzan testified that when plaintiff was treated at Southside Hospital, he was diagnosed with an "oblique fracture of the distal left tibia, and a proximal fibula fracture." (Tr. 101.) Dr. Ratzan explained that in the human lower leg, there are two bones - the tibia and the fibula. (Tr. 101.) The tibia is the larger bone located on the interior side of the lower leg and extends from the knee to the ankle. (Tr. 101.) The smaller, thinner bone in the lower leg is the fibula and its upper portion comprises part of the knee joint while its lower portion comprises part of the ankle joint. (Tr. 101.) Dr. Ratzan testified that a "fractured oblique distal tibia" means that the "lower third of the tibia[] was broken or fractured" and that the fracture was "angular." (Tr. 101.) Additionally, Dr. Ratzan testified that a "proximal fibular fracture" means that the "upper part of the fibula was broken." (Tr. 102.) Dr. Ratzan confirmed that when plaintiff was treated at Southside Hospital, his left leg was placed in a cast that extended from his big toe to his upper thigh. (Tr. 102.)

Dr. Ratzan further testified that plaintiff's neurovascular status was also examined while he was treated at Southside Hospital. (Tr. 103.) According to Dr. Ratzan, the results of that examination indicated that plaintiff had "decreased sensation on the dorsal aspect of his foot," which means that sensation was decreased in the upper part of plaintiff's left foot and big toe. (Tr. 103.) Dr. Ratzan testified that such a finding was significant because it indicates that plaintiff suffered injury to one of the large nerves located in the lower leg around the fibula that supplies sensation to the upper part of the foot. (Tr. 103.) Dr. Ratzan stated that there was no

indication in any of plaintiff's medical records that plaintiff suffered from this injury prior to his accident on February 19, 2003 and further stated that plaintiff specifically denied any previous problems associated with his left lower leg.[8]  (Tr. 103.)

Dr. Ratzan next testified concerning plaintiff's treatment by Doctors Dineen and Tejwani and confirmed that plaintiff underwent "open reduction surgery and internal fixation of his fracture" on March 10, 2003 at New York University Medical Center.  (Tr. 103-05.)  Dr. Ratzan testified that plaintiff's pre-operative diagnosis by Dr. Tejwani was a "left mid to distal third oblique tibial shaft fracture with a proximal fibular fracture."  (Tr. 105.)  Dr. Ratzan explained that during plaintiff's surgery, a rod was placed in his leg "under x-ray control" and a screw was then placed on the top of the rod and through the tibia bone to hold the bone in position, correcting the fracture as well as any shortening or alignment or rotational deformity plaintiff may have suffered.  (Tr. 106.)  The screw then holds the bone in a fixed locked position.  (Tr. 106.)  Dr. Ratzan noted that the tibia was the only bone operated on during plaintiff's surgery because the fibular fracture "is closed" and does not require a surgical procedure to correct.  (Tr. 106.)

Dr. Ratzan also testified that Dr. Tejwani's pre-operative diagnosis of plaintiff included a second condition as well, namely "foot drop of the left ankle and leg."  (Tr. 105.)  Dr. Ratzan explained that when there is a fracture of the tibia, the perineal nerve, which is the large nerve that wraps around the proximal head of the tibia and supplies the muscle that raises the ankle and big toe, as well as provides sensation to the upper side of the foot, can be compromised.  (Tr.

_____

[8]  As stated supra, however, plaintiff testified that he strained the ligament in his left ankle in 1987.  (Tr. 27-28.)

105-06.)  When this nerve is compromised, the muscle cannot raise the ankle or the big toe and therefore, the foot drops down as if the muscle is paralyzed.  (Tr. 106.)

Dr. Ratzan testified that upon plaintiff's release from New York University Medical Center, his left leg was placed in a cast and he was "non-weight bearing" such that he had to use a wheelchair and crutches for more than two months.  (Tr. 107.)  Dr. Ratzan further testified that plaintiff's foot drop progressively resolved over a period of six months during which time plaintiff gained motor strength and was able to ambulate better.  (Tr. 107.)  However, plaintiff experienced some residual effects of the foot drop up to the time he was examined by Dr. Ratzan and the loss of sensation in his foot persisted.  (Tr. 107.)

Dr. Ratzan went on to testify that at the time he examined plaintiff, which was approximately three years after plaintiff's accident, plaintiff advised him that he was experiencing pain in the back of his left tibia where the fracture had occurred.  (Tr. 109.) Plaintiff further advised Dr. Ratzan that he was experiencing discomfort at the site where the screws are located in his leg as well as intermittent swelling and inflammation.  (Tr. 109.) Plaintiff also advised Dr. Ratzan that he noted weakness in his left leg, preventing him from performing certain activities such as skiing, and that he experienced pain when attempting to run or walk more than four or five blocks.  (Tr. 109.)   Finally, plaintiff advised Dr. Ratzan that he had decreased sensation in the dorsal aspect of his left foot and big toe.  (Tr. 109-10.)  Dr. Ratzan testified that due to these problems, plaintiff had been unable to return to work full time at any point following his accident.[9]  (Tr. 109.)  In Dr. Ratzan's opinion, the symptoms that

---

[9]  The Court notes that there was no testimony to this effect by the plaintiff.  Rather, plaintiff testified that he returned to work at Sayville Manor "a few days" after his accident.  (Tr. 30.)

plaintiff complained of when examined in 2006 are "absolutely" causally related to the injuries he suffered on February 19, 2003.  (Tr. 109, 113-14.)

Dr. Ratzan conducted a physical examination of plaintiff when he met with him in 2006. (Tr. 111.)  During that examination, Dr. Ratzan noted that plaintiff experienced the following: (1) discomfort with his left ankle when walking in a heel/toe gait; (2) decreased sensation at the "dorsal aspect of his great toe and first metatarsal region;" (3) "decreased dorsiflexion of the left great toe with mild weakness of dorsiflexion of the great toe;" (4) slightly decreased ankle motor strength when compared to the right; (5) the screws were "palpable" in the "distal aspect" of his leg and slightly tender; (6) one centimeter atrophy of the left calf when compared to the right;[10] however, there was "no measurable shortening" and the circulation in plaintiff's knee was intact; and (7) areas of tenderness where the rod was inserted on the upper aspect of the left leg; however, plaintiff had full motion of his knee and it was stable.  (Tr. 111-12.)  Dr. Ratzan testified that after examining plaintiff, he diagnosed him as having a "displaced fracture [of the] left distal tibia and proximal fibula with foot drop."  (Tr. 112.)  In Dr. Ratzan's opinion, plaintiff has sustained a "permanent partial disability of his left lower extremity," which is causally related to the accident he suffered on February 19, 2003.  (Tr. 113.)  With respect to plaintiff's future prognosis, Dr. Ratzan testified that it is "guarded as to further residuals in the future," meaning that plaintiff's condition is not likely to change and he is not likely to experience any further improvement.  (Tr. 113.)

---

[10]  When questioned, Dr. Ratzner stated that the one centimeter atrophy indicates that there is weakness in the left leg.  (Tr. 112.)

C.     Donna Rebecca

Donna Rebecca ("Rebecca"), a United States postal employee for approximately twenty-nine years and the Postmaster at the West Sayville Post Office on February 19, 2003, testified on behalf of the United States.  (Tr. 59.)  Rebecca is currently employed at the Lake Grove Post Office but was employed at the West Sayville Post Office from 1989 to 2003.  (Tr. 59.)

Rebecca testified that during the time she was employed at the West Sayville Post Office, there was a "usual practice or procedure" in place when a snowfall occurred.  (Tr. 63.)  First, a contractor would plow the parking area in front of the post office "as far as he could get," including a portion of the sidewalk.  (Tr. 63, 78-80.)  This included a portion of Washington Avenue - the street that the post office is located on.  (Tr. 78-79.)  However, the contractor does not plow the section of Washington Avenue that automobiles travel on, but rather just the portion of it immediately in front of the post office where patrons park their cars in a perpendicular fashion.  (Tr. 78-79.)  Second, the postal employees would shovel any remaining snow that the plow could not reach.  (Tr. 63, 80-81.)  Rebecca testified that she performed this task approximately seventy percent of the time.  (Tr. 81.)  In addition, the postal employees would put down rock salt as often as was needed.  (Tr. 63, 81.)  Shovels and rock salt were always kept on hand at the West Sayville Post Office for this purpose.  (Tr. 70.)  Rebecca testified that, as Postmaster, she was responsible for handling customer complaints and she never received any complaints concerning snow or ice on the sidewalk in front of the West Sayville Post Office during the fourteen (14) years that she was employed there.  (Tr. 64.)

With respect to the date of plaintiff's accident - February 19, 2003 - Rebecca testified

-14-

that when she arrived at the West Sayville Post Office at approximately 8:30 or 9:00 that morning, she observed the plaintiff lying in the street behind a vehicle.  (Tr. 65, 89.)  Rebecca testified that she approached plaintiff, whom she knew "by sight" as the "gentleman that worked at the adult home . . . two streets away," at which time he stated to her that he fell and that he was hurt.  (Tr. 65-66.)  Rebecca did not inquire as to where plaintiff fell.  (Tr. 78.)  Rebecca further testified that there was also a gentlemen, whom she did not know, standing near the plaintiff, who left when Rebecca arrived.  (Tr. 65-66.)  Rebecca testified that she stood behind the plaintiff to prevent him from being hit by an oncoming automobile since he was lying on the ground and remained with the plaintiff for approximately ten to fifteen minutes until an ambulance arrived.  (Tr. 65-66.)  Rebecca could not recall whether she called for the ambulance or whether another postal employee did so.  (Tr. 65.)  Rebecca testified that the plaintiff did not make any comments to her concerning ice or snow on the sidewalk in front of the West Sayville Post Office while she was standing with him.  (Tr. 67.)

After the ambulance transporting plaintiff to the hospital left the West Sayville Post Office, Rebecca proceeded inside the building.  (Tr. 67.)  Rebecca testified that as she entered the post office that day - through the front entrance, as she typically did when arriving at work (Tr. 60-61) -  she did not observe any ice or snow on the sidewalk.  (Tr. 67, 91.)  According to Rebecca, if there had been any snow or ice, she would have immediately gone back outside to clear it and she did not recall having done so.  (Tr. 67.)  Rebecca further testified that she did not receive any customer complaints on February 19, 2003 concerning ice or snow on the sidewalk in front of the West Sayville Post Office.  (Tr. 67, 91.)  Nor did Rebecca receive any customer complaints concerning ice or snow on the sidewalk on February 18, 2003, the day prior to

plaintiff's accident. (Tr. 68, 91.) Rebecca could not recall whether she observed any ice or snow on the sidewalk at the time she left work on February 18, 2003, which was approximately 5:15 p.m., and stated that "[t]here could have been some somewhere" but that she did not "feel" any as she walked to her vehicle that day. (Tr. 89, 91.) Rebecca testified that had she observed or felt any ice, she would have reentered the West Sayvile Post Office, retrieved the shovel and rock salt and removed the ice from the sidewalk. (Tr. 91.)

Rebecca testified that although a snow storm occurred in the days preceding February 19, 2003, the parking areas in the front, the rear and on the side of the West Sayville Post Office were plowed four times on February 18, 2003 by the contractor engaged by the post office for that purpose. (Tr. 68-70, 78, 82; Def. Ex. J.) This included the portion of Washington Avenue immediately in the front of the post office that serves as a parking area for patrons. (Tr. 79.) However, as stated supra, the contractor does not plow the section of Washington Avenue that vehicles travel on and there was still snow on Washington Avenue on February 19, 2003. (Tr. 78-79, 85.) Rebecca could not recall whether she independently shoveled the sidewalk or put down rock salt in front of the West Sayville Post Office on either February 18 or 19, 2003.[11] (Tr. 70, 84, 89.) Nor was Rebecca aware if any other postal employees had done so. (Tr. 84.) Rebecca could also not recall whether she went outside to inspect the sidewalk at any point on February 18, 2003. (Tr. 85-86.)

---

[11] At her deposition in this action, however, taken on August 17, 2005, Rebecca testified that although she could not "distinctly remember" whether she shoveled the sidewalk in front of the West Sayville Post Office on February 16, 17, or 18, 2003, she did recall that she or another postal employee applied "snow melt" or "rock salt" to the sidewalk the day before plaintiff's accident - February 18, 2003. (Tr. 164-66.) Rebecca further testified that she applied rock salt to the sidewalk "usually any time [that she] shoveled." (Tr. 166.)

Following plaintiff's accident, Rebecca filled out a "non-vehicle accident form," as required of postal employees when an accident occurs. (Tr. 71.) On the form, under "Accident Description," Rebecca wrote "[c]ustomer fell on ice walking around the rear of his car in the street in front of the Post Office." (Pl. Ex. D, at 2.) Rebecca verified that Plaintiff's Exhibit D was a fair and accurate representation of the form she completed with respect to plaintiff's accident. (Tr. 71.) During voir dire examination by plaintiff's counsel, however, Rebecca testified that she did not witness plaintiff's accident and the description of the accident contained in the form was not a result of her own observations. (Tr. 72.) Similarly, on cross-examination, Rebecca testified that plaintiff never told her that he fell while walking around the rear of his vehicle. (Tr. 86.) Rather, plaintiff advised Rebecca that he had fallen and due to the fact that Rebecca observed him lying behind his vehicle, she concluded that he had fallen there as opposed to on the sidewalk. (Tr. 86-87, 92.) Rebecca testified that she is not aware of any other postal employees that witnessed plaintiff's accident. (Tr. 87.)

Rebecca testified that she also took photographs of the area in front of the West Sayville Post Office on the day of plaintiff's accident. (Tr. 73; Pl. Ex. A-1, A-2, A-9, A-10.) According to Rebecca, when she took these photographs, she had no indication that plaintiff claimed to have fallen on the sidewalk. (Tr. 75.) Rebecca further testified that, at some point following plaintiff's accident, she met with an investigator from the United States Postal Service, who took additional photographs. (Tr. 75-76.) During this meeting, the investigator requested that Rebecca indicate where, on the ground, she found plaintiff on February 19, 2003. (Tr. 76.) Rebecca testified that she did so by placing a traffic cone in the street upon which the West Sayville Post Office is located - Washington Avenue - where she testified that she observed

-17-

plaintiff lying.  (Tr. 76; Pl. Ex. A-8.)

D.  Rosalie Cuffaro

Rosalie Cuffaro ("Cuffaro"), the owner of the building located at 12 Washington Avenue in West Sayville, in which the West Sayville Post Office leases space, also testified on behalf of the United States.  (Tr. 131.)  Cuffaro has owned the property in West Sayville for approximately thirty-eight years and has leased it to the West Sayville Post Office for that time.  (Tr. 131.)  Cuffaro testified that she is familiar with the property upon which the West Sayville Post Office is located and that although there is no curb separating the street from the sidewalk in front of the building, she only owns the sidewalk.  (Tr. 132.)  The lease Cuffaro has with the West Sayville Post Office requires that the sidewalk in front of the building is to be maintained by the post office, not Cuffaro.  (Tr. 133.)

Cuffaro testified that during the thirty-eight years that the West Sayville Post Office has leased its office space from her, it has always maintained the sidewalk.  (Tr. 134.)  According to Cuffaro, the West Sayville Post Office engages the services of a contractor to clear any snow and they also put "Ice Melt" down during the winter.  (Tr. 134.)  However, Cuffaro testified that she does not possess any knowledge as to what, if any, actions the West Sayville Post Office took on February 19, 2003.[12]  (Tr. 135.)  As the landlord of the building in which the West Sayville Post Office is located, Cuffaro has never been notified of any slip and fall accidents other than the within one.  (Tr. 135.)

---

[12]  Cuffaro testified that she does not leave her house in the winter when it is snowing or there is ice on the ground.  (Tr. 136.)

E.     Michael Mayrose

The Government's final witness was Michael Mayrose ("Mayrose"), a postal employee for twenty years who is currently employed at the West Sayville Post Office and has been for the past eighteen years.  (Tr. 144.)  Mayrose is a clerk at the West Sayville Post Office, whose duties include assisting customers at the window and replacing the Postmaster when he or she is away.  (Tr. 144.)  Mayrose testified that he currently begins work at 8:30 a.m. and that he used to begin at 6:00 a.m. but as he became more senior in his postal employment, his start time became later and later.  (Tr. 144.)

With respect to the West Sayville Post Office's snow removal procedures, Mayrose testified that the post office maintains a contract with a snow removal service for plowing.  (Tr. 146.)  The postal employees shovel any residual snow remaining and put down rock salt.  (Tr. 146, 150.)  Mayrose testified that this procedure applies to the sidewalk as well and that he has shoveled and put down rock salt many times during his employment.  (Tr. 146.)

With respect to February 19, 2003, Mayrose testified that when he arrived at work, he entered the building through the front entrance.  (Tr. 147.)  Mayrose did not notice any hazardous conditions, such as ice or snow, as he entered the building that morning.  (Tr. 147.)  According to Mayrose, if he had, he would have shoveled and put down rock salt.[13]  (Tr. 147.)

Mayrose testified that approximately ten to fifteen minutes after he arrived at work, Rebecca arrived and informed him that she "saw someone lying behind their vehicle in front of the building."  (Tr. 149-50.)  Mayrose testified that he went outside at that point "out of

_____

    [13]  On cross-examination, Mayrose testified that he could not distinctly recall whether there was any snow or ice on the sidewalk when he arrived at work on February 19, 2003.  (Tr. 158.)

curiosity" to "investigate." (Tr. 147.) According to Mayrose, when he stepped outside, he observed a man - the plaintiff - lying on the ground behind a vehicle "propped up by his arm" and holding a cellular telephone. (Tr. 148.) Mayrose did not engage in any conversation with the plaintiff. (Tr. 159.) After less than one minute, Mayrose reentered the West Sayville Post Office, again using the front entrance. (Tr. 148.) Mayrose testified that he did not observe any snow or ice on the sidewalk as he reentered the building. (Tr. 148.)

Mayrose further testified that he remained at work for the entire day on February 19, 2003, during which time he did not receive any complaints from customers concerning snow or ice on the sidewalk. (Tr. 148.) Mayrose testified that he was also at work on February 18, 2003, the day prior to plaintiff's accident, and he similarly did not receive any customer complaints regarding ice or snow on the sidewalk that day either. (Tr. 148.) Mayrose could not recall whether there was snow or ice on the sidewalk on February 18, 2003 but he did recall that there was a "sloshy mess" on the street the day after plaintiff's "incident."[14] (Tr. 148-49, 155, 162.) Mayrose also observed a mixture of snow and ice "on the street" outside of the post office. (Tr. 155.) Mayrose differentiated the "street" portion of Washington Avenue, which he described as "blacktop," from the sidewalk area in front of the post office, which he characterized as "cement," and testified that it is not the responsibility of the post office to keep the "street" section of Washington Avenue clear of snow and ice. (Tr. 162.) According to Mayrose, that

_____

[14] At his deposition on August 17, 2005, however, Mayrose testified that upon his arrival at the West Sayville Post Office on February 19, 2003, he observed "a mixture of snow melting and ice from the night before. It probably froze up again." (Tr. 155-56.) When asked where he observed the mixture of snow and ice, Mayrose testified "[i]n the street and underneath where the cars parked. But we keep the sidewalk very clear." (Tr. 156-57.) During cross-examination in the bench trial conducted in this action, Mayrose recalled providing this testimony during his deposition. (Tr. 156-57.)

responsibility belongs to the Town of Islip.  (Tr. 162.)

Mayrose could not recall which postal employee shoveled the sidewalk in front of the West Sayville Post Office on February 18, 2003 but testified that the sidewalk was shoveled when he arrived for work that morning.  (Tr. 151.)  According to Mayrose, if the snowfall ended during the evening of February 17, 2003, the sidewalk would have been shoveled first thing in the morning on February 18, 2003 and typically, the first employee to arrive at the West Sayville Post Office that morning would have been responsible for shoveling.  (Tr. 151.)  Mayrose could not recall shoveling or applying any rock salt to the sidewalk at any point from February 17, 2003 through February 19, 2003.  (Tr. 158-59.)  Nor did Mayrose witness any other postal employee do so.  (Tr. 159.)

Mayrose testified that the West Sayville Post Office does not maintain a procedure by which "regular inspections of the sidewalk [are conducted] at regular intervals" following a snowfall.  (Tr. 151, 154.)  However, according to Mayrose, although such inspections are "not scheduled," the postal employees "make sure [the sidewalk] is always clear."  (Tr. 151.)  Moreover, the postal employees can observe the conditions of the sidewalk from the customer counter inside the building and if they observe a dangerous condition, such as ice or snow, they remedy it.  (Tr. 151-54.)

CONCLUSIONS OF LAW

I.  Federal Torts Claim Act

Section 1346(b) of the FTCA provides for a waiver of the federal government's sovereign immunity where a government employee commits a tort "under circumstances where

the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the [tortious] act or omission occurred."  28 U.S.C. § 1346(b); see also id. § 2674 (stating that the United States "shall be liable" for tort claims "in the same manner and to the same extent as a private individual under like circumstances").  Accordingly, "for liability to arise under the FTCA, a plaintiff's cause of action must be 'comparable' to a 'cause of action against a private citizen' recognized in the jurisdiction where the tort occurred," Chen v. United States, 854 F.2d 622, 626 (2d Cir. 1984) (citing C.P. Chemical v. United States, 810 F.2d 34, 37 (2d Cir. 1987)), and the evidence adduced by plaintiff "must satisfy the necessary elements of that comparable state cause of action."  Chen, 810 F.2d at 626 (citations omitted).

The applicable law to a claim against the Government under the FTCA is the law that the state where the tortious incident took place would apply "in like circumstances involving a private defendant."  Caban v. United States, 728 F.2d 68, 72 (2d Cir. 1984) (citation omitted).  Here, since plaintiff's accident occurred in New York, New York's negligence law applies.


II.     Negligence Under New York Law

Conduct is considered negligent when it "falls beneath the standard of care which would be exercised by a reasonably prudent person in similar circumstances at the time of the conduct at issue."  Harper v. United States, 949 F. Supp. 130, 132 (E.D.N.Y. 1996) (citing Holland v. United States, 918 F. Supp. 87, 89 (S.D.N.Y. 1996)) (additional citation omitted).  To establish a prima facie case of negligence under New York law, a plaintiff must demonstrate that: (1) the

defendant owed a duty to the plaintiff;[15] (2) the defendant breached that duty; and (3) the plaintiff was injured as a result of the defendant's breach.  See Akins v. Glens Falls City Sch. Dist., 53 N.Y.2d 325, 333; see also Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 215 (2d Cir. 2002) (citing cases).  Moreover, the plaintiff must establish that the defendant's breach was not just one factor but a "substantial contributing factor" in causing plaintiff's injury. McDermott v. City of Watertown, 936 F.2d 677, 679 (2d Cir. 1991) (citing Kush v. City of Buffalo, 59 N.Y.2d 26, 32-33 (1983)) (additional citations omitted).  Plaintiff "need not prove, however, that the defendant's conduct was the sole cause" of the injuries incurred.  McDermott, 936 F.2d at 679 (citing Digelormo v. Weil, 260 N.Y. 192, 200 (1932)).

Where the facts proven at trial demonstrate that there are "several possible causes of an injury, for one or more of which the defendant was not responsible, and it is just as reasonable and probable that the injury was the result of one cause as the other, plaintiff cannot have a recovery" since he has failed to establish that the negligence of the defendant substantially caused his injury.  Bernstein v. City of New York, 69 N.Y.2d 1020, 1021 (1987) (quotation and citations omitted).  "[W]hile inferences of negligence may be drawn from circumstantial evidence, those inferences must be the only ones which reasonably could be drawn from the evidence presented."  Mehra v. Bentz, 529 F.2d 1137, 1139 (2d Cir. 1975).  Conjecture or speculation as to a "possibility of causation" is not enough to establish liability on the part of the

---

[15] Because I credit plaintiff's testimony that he fell on the sidewalk in front of the West Sayville Post Office and not on the street behind his vehicle, as defendant asserts, I find that, as the possessor of the land, defendant owed plaintiff a duty of reasonable care.  See Salluce v. United States, No. 83-CV-392, 1998 WL 28992, at *1 (N.D.N.Y. Mar. 21, 1988) ("The United States, as sole tenant in control of the premises including the walkway, owed to plaintiff a duty of reasonable care commensurate with its foreseeability that persons such as plaintiff would use the walkway for ingress and egress.")

defendant.  Id. (citation omitted).  However, "[p]laintiff need not refute remote possibilities; it is enough for plaintiff to show facts and conditions from which the negligence of defendant may be reasonably inferred."  Bernstein, 69 N.Y.2d at 1022 (citing Negri v. Stop & Shop, Inc., 65 N.Y.2d 625, 626 (1985)) (additional citations omitted).

III.    Slip and Fall Liability Under New York Law

It is well-settled in New York that a property owner or possessor "may not be held liable for snowy or icy conditions unless it had actual notice, or in the exercise of due care, should have had notice of the conditions, and had a reasonably sufficient time from the cessation of the precipitation to remedy the conditions caused by it."[16]  Tsivitis v. Sivan Assoc., LLC, 292 A.D.2d 594, 594, 741 N.Y.S.2d 545 (2d Dep't 2002) (affirming summary judgment granted in favor of defendant where there was no evidence that defendant had actual or constructive notice of the ice on which plaintiff allegedly slipped or sufficient time to remedy the condition) (citation omitted); see also Rapone v. Di-Gara Realty Corp., 22 A.D.3d 654, 655, 802 N.Y.S.2d 721 (2d Dep't 2005) (affirming denial of summary judgment to defendants where plaintiff's deposition testimony that "the snowfall had ceased several hours before the alleged accident, that the roads in the area had been sufficiently cleared, and that the sun was beginning to peek through the clouds" was sufficient to create a genuine issue of material fact as to whether defendants had a sufficient time to remedy the snow and ice condition); Baum v. Farm, 259

---

[16]  A property owner or possessor may also be liable if he or she created the dangerous condition.  See Salvanti v. Sunset Indus. Park Assoc., 27 A.D.3d 546, 546, 813 N.Y.S.2d 110 (2d Dep't 2006); Cody v. DiLorenzo, 304 A.D.2d 705, 705, 757 N.Y.S.2d 789 (2d Dep't 2003). However, plaintiff herein is not claiming that defendant created the icy condition upon which he allegedly slipped, nor was any evidence to that effect introduced at trial.

A.D.2d 456, 456, 686 N.Y.S.2d 83 (2d Dep't 1999) (reversing denial of summary judgment to defendant and dismissing complaint where plaintiff failed to submit evidence establishing the origin of the icy condition that caused her fall or that defendant had notice of the condition or a sufficient time to remedy the condition).  When determining whether a defendant exercised reasonable or due care, "'an awareness of the realities of the problems caused by winter weather'" must be taken into account.  Goldman v. State, 158 A.D.2d 845, 845, 551 N.Y.S.2d 641 (3d Dep't 1990) (quoting Marcellus v. Littauer Hosp. Assn., 145 A.D.2d 680, 681, 535 N.Y.S.2d 224 (3d Dep't 1988)).

      A.     Actual Notice

As stated above, one way to establish a defendant's liability for a slip and fall is to demonstrate that the defendant had actual notice of the snow or ice condition present on its property at the time of plaintiff's injury.  See Rapone, 22 A.D.3d at 655; Tsivitis, 292 A.D.2d at 594.  A plaintiff may demonstrate that a defendant had actual notice of a hazardous condition where, for example, defendant's employees were present at the time of the accident or the defendant had received complaints concerning a hazardous condition.  See, e.g., Tuthill v. United States, 270 F. Supp. 2d 395, 400 (S.D.N.Y. 2003) (finding no actual notice where defendant's personnel were not present at the time of the accident and the defendant had not received any complaints of a dangerous condition); Byrd v. Church of Christ Uniting, 192 A.D.2d 967, 969, 597 N.Y.S.2d 211 (3d Dep't 1993) (same).  In the within action, testimony elicited by both sides during the bench trial established that, although there were postal employees inside the West Sayville Post Office at the time of plaintiff's accident on February 19, 2003, none were outside the building at the time that plaintiff fell.  Accordingly, none of

defendant's personnel could have observed either the ice alleged to have been on the sidewalk or plaintiff's accident. Moreover, as Rebecca testified, she never received any complaints concerning ice on the sidewalk in front of the West Sayville Post Office, either on the day of plaintiff's accident or in the days preceding it. Nor did plaintiff render any complaints about ice on the sidewalk.

Based on the foregoing, I find that defendant did not have actual notice of a hazardous condition on the sidewalk outside of the West Sayville Post Office at the time of plaintiff's accident.

B.     Constructive Notice

Where actual notice is lacking, liability may be still be imposed on a defendant for a hazardous condition if the plaintiff can establish that the defendant had constructive notice of the condition. See Rapone, 22 A.D.3d at 655; Tsivitis, 292 A.D.2d at 594. "To constitute constructive notice, a defect must be visible and apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it." Gordon v. Am. Museum of Natural History, 67 N.Y.2d 836, 837 (1986) (citations omitted); see also Tuthill, 270 F. Supp. 2d at 400; Hammond-Warner v. United States, 797 F. Supp. 207, 211 (E.D.N.Y. 1992). A "general awareness" that a dangerous condition "may be present" is legally insufficient to charge defendant with constructive notice of the specific condition that caused plaintiff's injuries. Gordon, 67 N.Y.2d at 838 (citation omitted); Cochetti v. Wal-Mart Stores, Inc., 24 A.D.2d 852, 859, 804 N.Y.S.2d 857 (3d Dep't 2005) (affirming grant of summary judgment to defendant where plaintiff's evidence "fail[ed] to show anything more than a general awareness that a potentially dangerous condition might exist"); Voss v. D&C Parking, 299

A.D.2d 346, 347, 749 N.Y.S.2d 76 (2d Dep't 2002) ("The defendant's general awareness that some dangerous condition may have existed . . . is insufficient, as a matter of law, to charge it with constructive notice of the specific condition, ice concealed by mud, which caused the plaintiff's injuries.").

Moreover, "[t]he mere existence of a [dangerous condition] on the sidewalk where the accident allegedly took place does not establish constructive notice." Hammond-Warner, 797 F. Supp. at 211 (citing Pirillo v. Longwood Assoc., Inc., 179 A.D.2d 744, 579 N.Y.S.2d 120, 121 (2d Dep't 1992)) (additional citation omitted). Accordingly, in order to demonstrate that defendant had constructive notice of the hazardous condition, plaintiff "must present evidence of the length of time the condition existed prior to the alleged fall" and "[i]n the absence of such evidence, the complaint must be dismissed." Hammond-Warner, 797 F. Supp. at 211 (citing cases).

Here, plaintiff asserts that defendant had constructive notice of the ice on the sidewalk that allegedly caused plaintiff to slip and fall because the ice was "clearly visible" (Pl. Summation Br., 13), and was present "on the surface of the sidewalk for a significant amount of time before [plaintiff] fell." (Id., 15.) Defendant, however, maintains that the ice was neither visible nor apparent, (Def. Proposed Findings of Fact and Conclusions of Law, 10), and that plaintiff "presented no evidence that the ice was present for a sufficient length of time prior to Plaintiff's fall." (Id., 11.)

By his own testimony, plaintiff asserted that the ice on the sidewalk on February 19, 2003 was not visible or apparent to him before he fell. As plaintiff testified, after the fall, the ice

was noticed while he was lying on the ground.[17]  Plaintiff offered no description of the ice with

respect to its size or height.  Moreover, both Rebecca and Mayrose testified that they did not

_____

[17]  In his Summation Brief, plaintiff asserts that the ice was "clearly visible" and that the reason plaintiff did not observe it prior to his fall is "because it was not in his line of sight as he walked from his car door to the sidewalk."  (Pl. Summation Br., 13 (citing Tr. 9).)  Although plaintiff references his trial testimony in support of this assertion, a review of that testimony indicates that no such statement was made by the plaintiff during the bench trial.  Rather, the testimony of plaintiff was as follows:

> Q:    Now, after you parked your car, Mr. Golden, on the morning in question, would you please tell the Judge what you did and what happened then.
>
> A:    I parked the vehicle.  I got out of the vehicle.  I locked the front door, closed the front door.  Umm, I walked onto the walkway, began to turn toward the entrance of the post office, and went down on the ground.  My left leg went out from under me.
>
>                              *       *       *
>
> Q:    When you said you started to turn, in which direction did you start to turn, right or left?
>
> A:    Right toward the entrance of the post office.
>
> Q:    Had you completed this right turn at the time the leg went out from under you and you fell?
>
> A:    I believe I was in the turn.
>
> Q:    Where were you looking as you were making this turn?
>
> A:    Probably towards the entrance of the post office, the entrance to the post office.
>
> Q:    Before your left leg went out from under you and you fell, did you see what it was that caused you to fall?
>
> A:    No.

(Tr. 9-10.)

observe any ice on the sidewalk upon their arrival at the West Sayville Post Office on February 19, 2003.  Nor did defendant receive any customer complaints concerning ice on the sidewalk outside the post office, either on the day of plaintiff's accident or in the days leading up to it - testimony that was not contradicted by the plaintiff.  Accordingly, plaintiff has failed to establish that defendant had constructive notice of the ice on the sidewalk at the time of his accident.  See Killeen v. Our Lady of Mercy Med. Ctr., 35 A.D.3d 205, 206, 827 N.Y.S.2d 19 (1st Dep't 2006) (finding no constructive notice where "[t]here were no known complaints of a hazardous condition, and even plaintiff had not noticed the black ice before he fell"); Carricato v. Jefferson Valley Mall Ltd. P'ship, 299 A.D.2d 444, 445, 749 N.Y.S.2d 575 (2d Dep't 2002) (holding that "there was no proof to support the plaintiffs' claim that the defendant had constructive notice of the ice patch" where "plaintiff's deposition established that the ice patch was not visible and apparent even to her as she stepped down on it"); Lewis v. Bama Hotel Corp., 297 A.D.2d 422, 423, 745 N.Y.S.2d 627 (3d Dep't 2002) (finding that "the alleged icy condition was not visible and apparent or in existence for a sufficient period of time to permit defendants to discover and correct it" where plaintiffs testified that they "did not see the alleged ice patch upon which [one of the plaintiffs] fell").

Plaintiff argues that the United States "was well aware of the slushy conditions of the area that persisted from the time of the storm until the time of the accident."  (Pl. Summation Br., 12.)  According to plaintiff, this knowledge, combined with the fact that patrons routinely parked their vehicles on the sidewalk in front of the West Sayville Post Office, where snow and water would fall off, accumulate on the sidewalk and freeze, "unequivocally" establishes that defendant had constructive notice of the ice on the sidewalk that allegedly caused plaintiff to fall.

(Id.) This argument, however, is not supported by the plaintiff's testimony. Moreover, a general awareness that a potential dangerous condition may exist is not enough to constitute constructive notice. See Gordon, 67 N.Y.2d at 838. Since plaintiff cannot demonstrate that defendant was aware of the specific condition that led to plaintiff's injury - ice on the sidewalk where plaintiff fell - he cannot establish constructive notice. See Voss, 299 A.D.2d at 347.

      1.    Recurring Problem

The plaintiff may alternatively establish constructive notice on the part of the defendant by "demonstrating a recurring dangerous condition in the area of the slip and fall that was routinely left unaddressed." Solazzo v. N.Y. City Transit Auth., 21 A.D.3d 735, 736, 800 N.Y.S.2d 698, 700 (1st Dep't 2005) (citing O'Connor-Miele v. Barhite & Holzinger, Inc., 234 A.D.2d 106, 106-07, 650 N.Y.S.2d 717, 719 (1st Dep't 1996)); see also St. Paul Fire & Marine Ins. Co. v. Tag 380, LLC, No. 05 Civ. 4917, 2007 U.S. Dist. LEXIS 74112, at *21 (S.D.N.Y. Sept. 27, 2007) ("Additionally, a defendant may have constructive notice of a hazardous condition if it had actual knowledge of a recurring problem in the area where the accident occurred.") (citations omitted); Tuthill, 270 F. Supp. 2d at 400 ("Alternatively, constructive notice may be attributed to a defendant who had actual notice of a recurring problem in the location the accident occurred.") (citing Hirschman v. City of New York, 193 A.D.2d 581, 582, 597 N.Y.S.2d 154, 154-55 (2d Dep't 1993)).

Plaintiff asserts in his Summation Brief that defendant had constructive notice of a recurring problem of ice and snow on the sidewalk in front of the West Sayville Post Office due to their knowledge that customers routinely parked their automobiles partially on the sidewalk and as a result, "snow and water would fall off the parked cars, accumulate on the sidewalk and

freeze." (Pl. Summation Br., 12.) According to plaintiff, "since defendant had actual notice of this reocurring [sic] practice, constructive notice of such condition, as a matter of law is attributable to them." (Id.)

However, as defendant points out in their post-hearing brief, there was no testimony adduced at trial to support a finding of constructive notice on the part of defendant as a result of a recurring problem. Although there was testimony on both sides that it was the regular practice of postal customers to park their automobiles with the front end partially overhanging the sidewalk, the only testimony concerning an alleged "recurring" problem of snow and water falling from these vehicles and freezing up came from Mayrose's deposition testimony, which was, at most, speculative. Mayrose testified at his deposition that when he arrived at work on February 19, 2003, he observed "a mixture of snow melting and ice from the night before . . . "[i]n the street and underneath where the cars parked . . . [that] *probably* froze up again." (Tr. 155-56.) (emphasis added). This testimony does not establish that the defendant had notice of any recurring problem of snow and water falling from the vehicles parked in front of the West Sayville Post Office and causing the sidewalk to freeze. Rather, Mayrose was opining as to what may have happened, which is nothing more than conjecture.

Moreover, as Rebecca testified, during the fourteen years that she was employed at the West Sayville Post Office, she never received any complaints, prior to the incident involving plaintiff, concerning ice or snow on the sidewalk in front of the West Sayville Post Office. Nor were there any similar accidents. In addition, as Cuffaro testified, in the more than thirty years that she has leased office space to the West Sayville Post Office, she had never been notified of any slip and fall accidents occurring on the property other than the one involving plaintiff. This

testimony was not contradicted by plaintiff in any way. Absent any actual notice of similar incidents in the past, constructive notice of the hazardous condition alleged to have caused plaintiff's injury cannot be imputed to defendant. See Solazzo, 21 A.D.2d at 736, 800 N.Y.S.2d at 699 (affirming grant of summary judgment to defendant where, inter alia, defendant's employee "testified without contradiction that he was unaware of any other accidents caused by slippery tiles at the station, demonstrating that the allegedly dangerous condition was not brought to defendants' attention by the occurrence of similar accidents in the past").

2.    Failure to Inspect

Moreover, a landowner or possessor of land has an obligation "to use reasonable care to inspect and repair common areas," such as a sidewalk. Wynn v. T.R.I.P Redevelopment Assoc., 296 A.D.2d 176, 181, 745 N.Y.S.2d 97, 102 (3d Dep't 2002). Accordingly, the property owner or possessor "is generally charged with constructive notice of a dangerous condition that a reasonable inspection would have discovered." St. Paul Fire & Marine, 2007 U.S. Dist. LEXIS 74112, at *20 (citing DiNunzio v. Ken-Jil Elec. Contractors, Inc., 473 F. Supp. 2d 485, 486 (S.D.N.Y. 2007)); Tuthill, 270 F. Supp. 2d at 400 (stating that "the issue of actual or constructive notice is irrelevant where defendant had a duty to conduct reasonable inspections of the premises and failed to do so") (citation omitted); Meyer v. State, 92 Misc. 2d 996, 1000, 403 N.Y.S.2d 420, 424 (N.Y. Ct. Cl. 1978) ("Where there is a failure to inspect, constructive notice need not be proved."). "[T]he adequacy of the [defendant's] inspection[]" is generally a question for the finder of fact. Wynn, 296 A.D.2d at 181, 745 N.Y.S.2d at 102.

In the within action, plaintiff asserts that defendant should be charged with constructive

notice of the icy condition that allegedly caused his fall due to its failure to conduct reasonable inspections of the sidewalk outside of the West Sayville Post Office on the day of plaintiff's accident. (Pl. Summation Br., 15-16.) Defendant maintains that plaintiff has failed to establish that defendant's inspection procedures were unreasonable. (Def. Proposed Findings of Fact and Conclusions of Law, 14.)

In order to hold defendant liable under a failure to inspect theory, plaintiff must demonstrate that defendant's "inspections were unreasonable" or defective in some way. Tuthill, 270 F. Supp. 2d at 400-01 (citing Watson v. City of New York, 184 A.D.2d 690, 690, 585 N.Y.S.2d 100 (2d Dep't 1992)) (additional citation omitted); Goldman v. State, 158 A.D.2d 845, 846, 551 N.Y.S.2d 641 (3d Dep't 1990) (affirming dismissal of plaintiff's case where plaintiff failed to demonstrate that defendant's snow-removal plan was "inadequate, unreasonable or not followed on the day of [plaintiff's] incident"). The testimony elicited at trial, and undisputed by plaintiff, is that defendant maintained a customary procedure for snow removal whereby an independent contractor would plow the portion of Washington Avenue that is immediately located in front of the West Sayville Post Office and serves as a parking area for patrons. The contractor would also plow as much of the sidewalk as possible. The postal employees would then shovel any remaining snow on the sidewalk and put down rock salt. This testimony was further supported by evidence offered by defendant that the contractor's plowing services, as noted above, were performed four times on the day prior to plaintiff's accident. (Def. Ex. J.)

Moreover, Mayrose testified that when he arrived at work on February 19, 2003, a few minutes before plaintiff fell, he observed that the sidewalk had already been shoveled. Mayrose further testified that he entered the West Sayville Post Office by way of the front entrance at two

separate times on February 19, 2003 - first, when he arrived at work that day and second, after going outside to observe plaintiff lying on the ground - and at neither time did he recall observing any ice on the sidewalk. Rebecca also entered the post office via the front entrance on February 19, 2003 - as was her typical routine upon arriving at work - and she also did not recall seeing any ice on the sidewalk at that time.

While it is true that neither Rebecca or Mayrose had any independent recollection of shoveling on February 18 or 19, 2003, that is not surprising given the fact that their depositions were taken more than two years after the incident and their trial testimony took place more than four years after it. Rebecca and Mayrose both testified to the typical snow removal procedures followed by defendant at the time of the accident and plaintiff failed to offer any evidence demonstrating that such procedures were not followed on the day of or days leading up to plaintiff's injury. Although Mayrose testified that defendant does not maintain a formal procedure by which regular inspections of the sidewalk are conducted at specific intervals following a snowfall, there was a procedure in place whereby the postal employees ensured that the sidewalk was clear of snow and ice: (1) employees were able to observe the condition of a portion of the sidewalk from the customer counter inside the building and remedy any hazardous conditions they observed; (2) postal employees used the front entrance regularly for ingress and egress and observed the condition of the sidewalk; (3) shovels and rock salt were maintained on site to remedy any dangerous condition; and (4) postal employees arrived at the post office prior to any patrons and were expected to ensure a clear and safe entrance and exit for patrons. Plaintiff failed to offer any evidence that the foregoing inspection procedures were unreasonable or flawed at the time of his accident. Accordingly, I find that the procedures that were in place

to ensure the safety of postal patrons entering and exiting the West Sayville Post Office were reasonable, and that the United States did not have constructive notice of the ice alleged to have caused plaintiff's fall on February 19, 2003.

Based on the foregoing, I find that defendant did not breach its duty of reasonable care and therefore was not negligent with respect to the existence of any ice that may have caused plaintiff's injury.

JUDGMENT

IT IS HEREBY ORDERED, ADJUDGED AND DECREED, that plaintiff's complaint asserting a claim for negligence is dismissed in its entirety and judgment is awarded to the defendant.

The Clerk of the Court is directed to enter judgment accordingly and mark this case as closed.

SO ORDERED:

Dated: Central Islip, New York
      March 28, 2008

                                        /s/ E. Thomas Boyle_____
                                        HON. E. THOMAS BOYLE
                                        United States Magistrate Judge

-35-